1730258 Star Financial Services, Inc. v. Cardtronics USA 1730258 Star Financial Services, Inc. v. Cardtronics USA 1730258 Star Financial Services, Inc. v. Cardtronics USA 1730258 Star Financial Services, Inc. v. Cardtronics USA Star Financial and CDS entered into a contract in 2012. It had the somewhat obscure name of ATM Deployer Services Agent Agreement. It was an ADS or CDS form contract according to the affidavit of Mr. Marcos, our CEO, which is in the record. That's at page 140 in the record. The contract itself is in several places. It's in the record excerpts. It's attached to the complaint. Most of the record, for that matter, consists of some ACH statements that really aren't particularly germane to the issue before the court today. So the actual number of pages that you'd have to consider is probably under 50 pages. And the crux of the agreement is that CDS is to provide setup and processing services for ATMs that are owned or operated by Star Financial. These are the sort of ATMs that you might find in a convenience store. They're not bank ATMs. They're independent ATMs. So to explain how the relationship is supposed to work, as well as the events that gave rise to the litigation, we prepared a chart that I believe has been given to you. It's just a simple schematic. And what we did is that there was a customer who would withdraw $100 from an ATM that is one of the ATMs subject to this agreement. That ATM is stocked with cash from a bank account, a Star Financial bank account, that is generally referred to by the parties as a settlement account. So when the customer withdraws $100, CDS, which is handling the processing, electronically causes $100 to be debited from the customer's bank account. And it also causes a transaction fee to be debited, the sort that the ATM will give you a warning about and require you to affirmatively state that you agree to. The transaction fees go off into a separate account. They're not really germane here. And CDS charges Star Financial a small fee that's set in the contract for each transaction it processes. When CDS debits the $100, it places that $100 into a master account that CDS manages. And it's the next step that created the issue. What was supposed to happen, and I don't think there's any dispute about what was supposed to happen. The question is why it didn't happen and who bears the responsibility. What was supposed to happen is that that $100 would be pulled out by CDS from its account and put back in the Star Financial settlement account, and the process would start all over. What in fact happened for two of the machines that were subject to the agreement is that that $100 and any other amounts that were being withdrawn ended up going into an account owned by a third party, which unfortunately also has the name Star. It was called DC Stars, but it's an entirely separate operation. And by the time that problem was picked up, $250,900 had gone into the wrong account. And the question that was before the district court and the question before this court is whether under the contract, given the circumstances that I'm about to describe, there is a claim that can survive summary judgment by Star Financial against CDS because of the way that the processing was handled. I've given you some of the relevant contract provisions. The contract itself is single space. And if you look at that, 2.1 of the contract provides the general purpose, the services to be provided by CDS. And it says CDS is supposed to link the terminals, those are the ATMs, with one or more networks and to transmit transactions initiated at such terminals. So you don't use up all your time on the background. No, I understand that. The fight here is over Section 4.1. 4.1, right. And so the question is, how do you do that? And the way that you have to do that, how does CDS know where the money is supposed to go? The way it's supposed to find out how the money is supposed to go is there's a terminal setup form that has to be provided by Star Financial. What happened here, and I've given you examples of two of the setup forms that are at issue here, is that in the setup form, Star Financial has to provide the identity of the settlement account, the bank account, that the money is supposed to go into. There's no dispute that it provided that information initially on August 19th of 2015 for three machines, and the information provided was incorrect. It contained DC Star's information, and it provided that by e-mail. The next day, it then caught the mistake. It notified CDS that there had been a mistake, said we're going to be sending corrected setup. Those machines weren't even in operation at that time, right? Correct. They did not go into operation until November. Were they at some places that were under construction, or how did that happen that they were put down somewhere and they weren't operating right away? It's not in the record, Your Honor. I don't have that answer. They were going to be coming online, and so the setup information was being provided so that when they came online, everything would be ready to go. So the next day, corrected account information was provided. And then put it for two of the machines. Yes. So why did the district court rule against you? What the district court said, the district court said that we were asking them to verify the information in the forms. And that's not right. And that's not right. If you look, it's page four of the district court's opinion, page 766 of the record. What they do, what the district court did is it simply misunderstood the issue before. It said the plaintiff argues that the defendant was obligated to correct any inaccurate information regarding the ATM terminals. That's not our argument. If we had not corrected the information in the setup sheet, and money as a result had been diverted into the DC STARS account, that would be on us. That's what 4.1 says. We represent and warrant that all information in the application is correct. It's the middle of 4.1. We agree with that. But it also says, the last sentence of 4.1 says, agent must immediately notify ADS in writing of any change in the information set forth in a terminal setup form. Let's suppose we just, in the middle of the operation of an ATM, decided to change our settlement account. We stopped operating with Bank A, we go to Bank B, we provide CDS with the corrected information. They're supposed to input the corrected information. It's no different here. And in fact, Judge Jones, as you pointed out, these ATMs weren't even in operation. And in fact, they understood what they were supposed to do because there were three ATMs that had setup information provided through the same emails, three separate setup sheets. And then three corrected setup sheets provided the next day. They corrected the information for one of the three. But for some reason, they missed the other two. So our argument is, no, you don't have to verify the information on the sheets. But as a matter of very simple contract law, when we provide you corrected information, changed information, we provide it to you in writing, paragraph 4.1 makes very clear at that point we've done what we need to do. They simply didn't input the change. And our position is that's a breach of the contract. That was our position in the district court. For whatever reason. Did you move for summary judgment? No. We didn't move for summary judgment because they had asserted some other defenses, defenses related to damages, defenses related to what information might have been obtainable through various ACH reports. So we didn't think it was appropriate for us to file a cross motion. But we think on this particular issue, there is no dispute as to the evidence. The only evidence that was submitted by the plaintiff was the contract itself. And in response, we submitted the evidence showing how the setup forms were originally transmitted, how the corrected forms were transmitted, together with an affidavit explaining what happened, that eventually we figured out that there was a problem. We did some investigation. And we found that these two machines had been linked to the wrong settlement account, to this DC STARS settlement account. We tried to recover what we could from DC STARS, but there's still about $155,000 that has not been recovered. So it's a very simple breach of contract claim. Who got the $250,000? Excuse me? Who got the $250,000? It was an outfit called DC STARS, which runs some convenience stores in the Washington, D.C. area. My client actually operates in Virginia, Maryland, and the District of Columbia, but there is a venue selection clause in the contract, which is why we're here. And so the convenience store owner, we've recovered about $100,000, but there's $155,000 that's still unrecovered, and that's the damage that we're seeking in this case. Now, they're also relying on paragraphs 4.3 and 9.3, are they not? Well, we talked to them. Let me address the 9.3 issue. On 9.3, we made some argument there, and they said that just relates to damages, and they suggested we were seeking an advisory opinion. And the only reason we raised 9.3, they raised some damage issues in their summary judgment motion, which were not addressed by the district courts. I don't think 9.3 is on the table. 4.3 has to do with, again, with the question of what you can pick up from essentially line-item statements. I believe when we raised 4.3 in our opening brief, they also said that's a damage question, it's not properly before the court, we're seeking an advisory opinion. But our position on 4.3 is this is not a line-item issue. This is not something you can pick up from line items because the ACH report that gets generated is an ACH report for transactions that take place in our settlement account. If there's a transaction that's not taking place in our settlement account, like the money is going over here, it doesn't show up on the report, and therefore 4.3 is irrelevant. Isn't that your fault? Excuse me? Isn't that your client's fault that the money doesn't, that the default doesn't show up immediately? No, it's their reporting system. We can download. It's sort of like they're the bank and we can go in and, I mean, they're not the bank, but it's like getting a statement from the bank of transactions that have taken place. So it's their report, not ours. I see. So our position is really very simple. The district court apparently misunderstood the argument, misunderstood our position, and thought that what we were saying is when we give them one of these setup forms, they have to verify the information. That's not our position. Our position is when we give them information on the setup form, they have to use that information when they set up the ATM within the system so that the money flows where it's supposed to go. And we provided them that information. We initially provided setup forms that had the wrong information. We then corrected it. They acknowledged receipt of those corrected forms. They changed the setup for one of the three. They did not change it for the other two. There's at a minimum a genuine issue of fact as to whether there's been a breach of contract. So this case should be reversed and remanded. Did you have an oral argument before the district court? No, Your Honor. Okay. And I believe that, unfortunately, is one of the issues. I think there was a misunderstanding. Did you ask for it, or is there a process for asking for it? There is a process. We did not ask for it. We, obviously, in hindsight and mistake, thought that it was fairly clear. Okay. Mr. Dillard. Good morning. May it please the Court. We do agree that this is a fairly clear case. There's a lot that is not presented to the Court, but was certainly clear for the district court and the reason why the district court, we believe, ruled in our favor for summary judgment in this case. We believe the entire factual dispute in this case comes down to essentially three sections, section 4.1, 4.2, and 4.3 of the contract. That's what was specifically relied on in our motion for summary judgment, and that was the analysis that the district court went through in granting the summary judgment. Now, the appellants, they go through this process and they have demonstratives to show the court, here's what happened and here's hypothetically how this $100 bill process is supposed to work. What they don't show you in this demonstrative, which is the key fact at issue in this case, is the fact that the initial terminal setup forms were undisputedly, for these three terminals, incorrect, and that information was provided by them to us incorrectly. Now, what that does is that triggers certain things under this contract in 4.1, 4.2, and 4.3. Most importantly, in 4.2, and if you look at their description of 4.2 in the demonstrative that they provide the court, you'll notice that their 4.2 abruptly stops, and it doesn't give you the next sentence, which is the key issue in this case, and I believe the reason why the district court granted a summary judgment. Section 4.2 states that all settlements shall be affected through automatic clearinghouse transfers. It is the responsibility of the agent, that is Star Financial, that is the appellant in this case, to verify that all information in a terminal setup form, ACH authorization, or any modification thereto is correct and complete. ADS has no responsibility to verify such information. They get hung up on that point and say that that's what the argument is about. That's not what the argument is about. The argument is the very last sentence in this section. ADS, agent shall indemnify and hold harmless ADS from any and all costs, including attorney's fees, claims, damages, liability, loss, demands, causes of action, including without limitation, costs or investigation and litigation arising out of or related to any incorrect information submitted on a terminal setup form, ACH authorization, or any notice or change related thereto. That is precisely what we have here and the reason why they are not able to establish any breach or any damages to sustain their breach of contract case. This contract is very clear that if there is an issue and it is their fault, the initial, the D.C. Weren't there three terminals involved initially? Yes, Your Honor. There were three. I think there were several different terminals. There were three specifically that they provided incorrect information for, and those three, because of that, come under section 4.2. But then they provided correct information. So, yes, they did do that. And the correction got made as regards only one of the three. That's correct. The issue we believe in— Did you make that correction? Our folks did make that correction. What I understand factually and what the record shows on that issue— That was just, you weren't obligated to do it, but you did it. There's nothing in the contract that specifically obligates us to make that correction. Excuse me? They're paying you for directing money properly from the debit machines into their account, and you have no obligation once they inform you of an error to—that's absurd. Respectfully, Your Honor, that's not the point that I'm making. Well, it sounds like it. The issue related to how they informed us and what the record actually shows on that, the forms themselves show how they are to be submitted, and this is the third demonstrative that they gave the Court this morning, and has at the bottom of the form an actual e-mail address for e-mailing the forms to. What they did in this case is they didn't follow that procedure. They didn't e-mail the forms to that form, to that group. What they did, and what the record has shown on that, this is Record on Appeal 167 and 165, is they e-mailed somebody at the company and said, hey, we made a mistake. Again, when you walk into the procedure of the contract and what the parties specifically contracted for, that is not — certainly that individual tried to do what they could to correct the forms, but they themselves did not go through the process. So, again, you have the issue of the incorrect forms being set up, which they don't And then under Section 4.3, which — But that goes to the merits, not to whether there's a disputed issue of fact over breach. Well, we don't believe that there is a — we don't believe that there is a breach. Well, it seems — well, I mean, to me, you just look at the contract. The provisions of the contract, it seems to me, set this up, and then the facts are what really happened about the errors and so on and who tried to correct what, and then the jury will look at the facts and compare them with the language of the contract. I believe that the Court, as a matter of law, can and did look at Section 4.2 and 4.3 and rule on this issue in a dispositive manner. Section 4.3, which the Court asked appellants about, which they didn't have much of a response for,  particularly those accounts that — They hadn't — the machines hadn't even opened yet. Understood, Your Honor. You can't monitor anything if it hasn't started. Well, I don't know that I agree with that, Your Honor. They have access to the accounts. They make this argument under Section 2.1 that they weren't connected to the network. They absolutely were. In the affidavit of their CEO, they state that they actually went in to the network and ran settlement setup summaries and that those were available through the ACH portal. That's the record of 143 in the affidavit of their CEO. So they could have at any time and did go in, look at the accounts, and make sure that these accounts were set up properly. They didn't do that. And what the procedure and what the parties specifically agreed to in Section 4.3 is that they are to periodically monitor the accounts and that they have to do that, and if there is a dispute or if there is an account that's set up incorrectly— They monitored within 24 hours, found out, figured out that the routing information was wrong and sent in a form to correct it. And, you know, this form you're showing us says faxed to such and such a number, emailed to such and such, or mail to Columbus Data Services Attention Settlement. Well, the record does not show that they did any of those things. They emailed an employee of the company not at any of those addresses. So, again, even if you assume that they properly put it in, even if we make that concession, which we're not making, the record doesn't show that they did that, under 4.3, they are not entitled to get any damages because the underlying issue, again, relates to the error in the setup form that they started originally. If we inputted the information incorrectly, if we had put it into the wrong account, then there would be damages, and that would be under 9.3, that would have a limitation. You don't get there unless, you know, you put these paragraphs all together and you've got the fact that, A, they sent you the wrong information, B, they immediately tried to correct it, C, somebody at the company acknowledged that it was correct, that there was a need to change something, D, your company didn't change something, and E, well, your excuse is, the company's excuse is that, well, that's because you didn't notify us properly. So all those are, it seems to me, facts about the application of the contract provisions. We believe, Your Honor, that when you read Section 4.2, which talks about their obligation to set up the information and that they waive any liability or any claims resulting from submitting initially incorrect forms, that those claims go away, along with Section 4.3, that they're not able to seek damages for them. If money, and part of the reason why they have any damages in this case is because their own inattention to these accounts allowed this improper setup for eight months, and it was setup done pursuant to their direction. Yeah, except that your fellow said he'd make the corrections. Again, Your Honor, I respectfully disagree with the Court on that point. They have nothing in the record that they appropriately raised the issue. The forms themselves that are in the record. It was an accident. It was just purely serendipitous that some employee at your company was able to correct one of the terminals. Well, Your Honor, I mean, we're in business with them. We were in business with them and attempted to make the change. The customer is always right. Well, again, you've got to look at the contract, and the contract ultimately controls. The parties specifically agreed to these terms, CBS. I don't have a view as to who should win the dispute. It just seems difficult to me to say that it's entirely solved by the four corners of the contract and a couple affidavits. Well, I believe the reason, Your Honor, for that and what was found by the District Court in walking through Section 4.2 and 4.3, they cannot show any recoverable damage for this conduct. The entire course of the $250,000 that they claim in damages, 100,000 of which they were recovered, is talked about in 4.3. Well, maybe I misunderstood things because the way I read the briefs, I thought your argument was that they were in breach, and therefore they couldn't recover damages. And you also had an exculpatory clause that said we're not even liable for our own mistakes, which I thought was very an odd way to put things. The arguments that we made in our brief and the arguments that we made to the District Court are that the four corners of the parties' contract, specifically Section 4.2 and 4.3, support summary judgment and a ruling as a matter of law because there is an admission that they set up the forms incorrectly, that is expressly dealt with in 4.2, that they have that responsibility, and that they have to indemnify and hold harmless and release us from any claims arising out of the incorrect information submitted or any notice or change related thereto. Well, I could see that being the case if the terminals had gone into operation immediately and in the first 24 hours X amount had been taken out of the terminals and under the settlement procedure went to the wrong account before they notified your client. But what you're saying is that if there's any mistake whatsoever at any time, your company is not liable for it. Is that right? If the mistake relates to an incorrect terminal setup form that was an error by them, that is correct under Section 4.2. The hypothetical that your — Even if it's your mistake? No. Well, it's an — that's a different question. If it's our mistake, then 4.2 doesn't come into effect. Isn't that the problem? You've got the chicken or the egg here because you say it's their mistake. They say it's your mistake. No, no. They absolutely admit, and they admitted in the district court and they admitted before this court, that the initial terminal setup forms for those three accounts were incorrect. I understand that. And you're — and, well, you're not willing to admit, but the fact — you know, the fact is in the implementation of the contract, your fellow acknowledged and corrected a mistake in the — acknowledged their correction of the setup forms at least as to one account. That is correct. We did. The specific — But the fact that he only did it as to one and not the other two is not a mistake, according to you. Well, it's not a mistake, and even if it is a mistake, it is a mistake that is arising out of or related to incorrect information submitted on a terminal setup form or a change related thereto which takes us back to 4.2 and is excluded. But even if you get to that point in the process of how the money is going out and how the funds are set up, that is specifically called out in Section 4.3, and there is no monetary damage that they can recover for that. They are supposed to be monitoring the accounts, which is what their obligation is in 4.3, and looking to see how they're set up. In this particular case, we believe it's even more egregious because there is such a gap between how it was set up and when they ultimately noticed the issue. I didn't say I was predicting who would win. I just thought that went to damages and not to the question of breach, and they're saying there's a fact issue on breach. Well, I think — well, I think the Court — this Court looks at the breach of contract question de novo and can affirm the district court's summary judgment on either breach or damages. We believe that certainly in looking at Sections 4.2 and 4.3, they are unable to establish any damages. We don't believe they're able to establish breach either, but 4.3 specifically says agent, which is them, shall audit the balances and the data contained in the statements and the reports provided. We know that they were able to do this, again, because their own CEO's affidavit testified that after eight months, that's what ultimately the reports that they pulled up and looked at. I'm sorry to say, given the case I forgot, did the district court rule on the damage provisions, or did she — The district court did not get to the damage provisions. The district court looked at the contract and said that they cannot prevail as a matter of law and granted summary judgment and did not get to the specific damage provisions. But the Court can look at the record and look at this de novo in 4.3, and again, they have to notify — And you moved on that basis. We moved on that basis. Promptly, but in no event more than 30 days after the date of the disputed item. So again, if there is a dispute, if there is this $100 that was improperly taken out, it's going to pop up on their report. They notify us pursuant to 4.3, and we have to use commercially reasonable best efforts to help them get that money back within those 30 days. But again, the party specifically agreed — Is it in the record as to how they got this — the $90,000 or whatever it was back? I don't — it could potentially be in the affidavit of their CEO. I don't believe that they specifically state other than that there were — they worked with CDS, our predecessor company, to try to claw the money back from the funds, which we helped them do, and they were able to get some portion of those funds back. They weren't able to get all of it back because I don't believe those accounts that they had originally set them up for had sufficient funds in them to do that. But again, under 4.3, it states that ADS and CDS will use their commercially reasonable efforts to recover any amounts over such 30 days, period. Neither ADS nor CDS shall be liable for any damages, interests, or costs associated with the error other than correcting the error. That's it. That's Section 4.3. If there is an error, if it wasn't corrected, they have a 30-day window. They admit that the monies that they're talking about are $150,000 eight months — six, seven, eight months later. So, again, you have to look to the four corners of the contract that the parties specifically agreed to, what the parties negotiated in minimizing the risks and costs associated with this. And, again, all of this relates back to an initial terminal setup form that was incorrectly set up by Star Financial. And under 4.2, because of that — and, again, the sentence that they don't want you to see and is not included in their demonstrative — is that they will indemnify and hold harmless us from any and all information — any and all claims, any and all liabilities are rating out of the original incorrectness or any change related thereto. So, again, there's nothing in the — there's nothing in the record to show that these forms were properly submitted. They were not emailed, mailed, or faxed to this number. They emailed it to an employee at the company. That employee at the company attempted to do what they could, but, again, it was not sent to the right department, which is the why this happened. I mean, let me just ask a really dumb question out of the record. How big is your client's company? I don't know the answer to that, Your Honor. It's more than three or four employees? Yes. Okay. A lot more? I believe it is, Your Honor, but the specific size of the company is not in the record. Okay. I believe it certainly is big enough that a form being emailed to one — there's a whole separate department that handled the setups where these forms did not go. So there was an email, and I'll point out for the record, one of the emails that they cite, it's either 167 or 165. They do send a notification that there is an error in one of the forms and that corrected forms will be coming to settlement setup at columbusdata.net. That email does go out, and it's either 167 or 165. However, the attached forms never go to that email address. All right. So I think that's important for the Court's consideration. And again, in walking through what the district court's findings were and looking at the contract, this is a case on a breach of contract claim that should be decided as a matter of law. We believe the district court found correctly that within the four corners of the contract, particularly sections 4.2 and 4.3, that there was no breach. But this court, even if the court disagrees on there's a fact issue on breach, that there's certainly no issue with respect to damages and the court can affirm, and therefore we ask this court to affirm the district court's opinion. Thank you. The entire argument relating to where the forms should have been sent, where the email should have been sent, is new. It was never raised below. And, in fact, what we have in the record, this begins as an email chain record 172. August 20th, 1021 a.m., an email from Star Financial to someone named Tammy Reed at Columbus Data, which is CDS. Hi, Tammy. The settlement forms that I sent you in my second email were incorrect. Please find attached settlement information. A response at 2.05 that afternoon from Tammy Reed back to Star Financial. Okay. I have forwarded the revised forms to settlement at a minimum. There's an issue of fact there. And, in fact, we know they got to settlement because they changed one of the three. But it's a new argument. It really is not one that this court should consider first impression on appeal. Second, and Judge Jones addressed this in some of her questions, both 4.1 and 4.2 contemplate the possibility that there will be changes in the setup information. The last sentence of 4.1 says we have to immediately notify CDS in writing of any change in the information. And the sentence in 4.2 that opposing counsel relied on, this warranty language, it refers to notice of change. If there's an error in the notice of change, we have to hold them harmless. Well, why on earth are we going to have the right to submit change forms and to submit changed information if they don't have a corresponding obligation to implement it? It's an argument that simply doesn't make sense. We make a mistake at the beginning. We're stuck with it forever. That's their argument. Finally, let me get to 4.3. At a minimum, well, two things. At a minimum, there's going to be an issue of fact as to whether we could have found this information that they're saying we should have been able to find by review of the statements. The affidavit from Mr. Marcos. And this, his affidavit, is part of the response to the motion for summary judgment. It begins at page 139 of the record. And if you look specifically at page 143 of the record, he describes what information is available on the so-called ACH reports. And what he says, and it's enough at a minimum to create an issue of fact, is those ACH reports are keyed to particular bank accounts. When we monitor these reports, and the reports aren't reports about how the machines are set up, that's not the kind of report that 4.3 is talking about. They're talking about line items. Every time there's a withdrawal, there's a line item, and it's linked to a settlement account. So if my client pulls the ACH information for its settlement account, it will find every transaction involving that settlement account. But, of course, it's not going to find these transactions because they went to a different account. That's the whole problem. And at a minimum, that affidavit creates an issue of fact as to the applicability of 4.3. And even his argument is at some point we should have found the problem. Don't you have to reconcile the amounts that went in and the amounts that went out of each terminal? Well, but you don't do it by terminal. You do it by account. There are almost 200 machines that are linked to this particular account. And there are also timing issues. And they're all over New Jersey and Maryland or something? Maryland, Virginia, D.C., including D.C. Stars, unfortunately, in D.C. And there are timing issues. The flowchart that I gave you assumes that everything is happening at the same time, but it doesn't. There are timing differences. And so what began to happen, according to his affidavit, which creates an issue of fact, is quite simple. Gradually, they saw some balances that started to look a little low, but it took a while, and then they jumped in. I understand all that. Of course, none of that has anything to do with the 30-day requirement. The 30-day requirement. Okay. Yes. The 30-day requirement has to do with if there is a particular line item that appears to be incorrect, you have 30 days to come and correct it. It has nothing to do with something that isn't going to show up on the report at all. That's our position. Okay. Thank you, Your Honor. Thank you very much. The court will be in recess until 9 o'clock tomorrow morning.